**ITT LIGHTING FIXTURES, DIVISION OF ITT CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 82–1328, 82–1499.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1983.

Decided Oct. 6, 1983.

George W. Loveland, II [Lead Counsel] Young & Perl, Arnold Perl (argued), Richard M. Kobdish, Memphis, Tenn., Gregory Muzingo, Detroit, Mich., for petitioner.

Elliott Moore, John Elligers (argued), Deputy Associate Gen. Counsel, Gerald P. Fleischut, Region 26, N.L.R.B., Washington, D.C., Fred Havard, Memphis, Tenn., for respondent.

Before MERRITT and MARTIN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

MERRITT, Circuit Judge.

In this case, ITT Lighting Fixtures challenges, and the NLRB applies for enforcement of, a determination by the Board that the company violated the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, on three occasions involving three separate employees. The most important question arises from the Board's determination that ITT violated Section 8(a)(1) of the Act as interpreted in *NLRB v. Weingarten,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975) when the company denied employee Terry Williams his request to have a fellow employee present at a meeting with several of his supervisors. The Board also found that ITT violated Sections 8(a)(1) and (3) by firing employee Harry Merriweather for supporting the union. Finally, the Board held that ITT had improperly transferred employee Jo Ann Gray to a smaller facility in order to reduce her effectiveness in promoting the union during a union drive.

### I. The Williams Suspension

ITT operates a manufacturing plant in Southaven, Mississippi, with about 340 employees, and a distribution center eight miles away in Memphis, Tennessee, with approximately 20 employees. The United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, began an organizational campaign at the plant in October, 1978. The union filed an election petition in December, 1978 and a Board-conducted election was held on February 16, 1979. The union won the election by a 22-vote margin but the company filed election objections which apparently remain unresolved.

It is undisputed that employee Terry Williams left work at the distribution center one-half hour before his shift ended on April 28, 1979, in order to pass out pro-union leaflets at the main plant. After confronting Williams, the plant manager called the personnel office at the Memphis distribution center to inform them of Williams' activities. The following morning Williams was called to a meeting with Mike Hareless, a personnel administrator, Robert Fisher, a supervisor at the Memphis facility and Jo

Ann Gray, his immediate supervisor. When the management personnel began to ask Williams questions about his unauthorized absence, Williams immediately requested that a fellow employee be permitted to attend the meeting. Williams was told that it was unnecessary to have a witness since the supervisors were only going to ask a few questions. His request was denied. The managers then proceeded to direct questions for fifteen minutes at Williams who continued to refuse to respond. Williams was suspended for three days.[1]

■ Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, guarantees employees the right "to engage in . . . concerted activities for . . . mutual aid or protection. . . ." In *NLRB v. Weingarten,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), the Supreme Court interpreted this broad language to include the right of an employee to have a union representative present at certain meetings with an employer. The Court limited this right to situations in which (1) the meeting is investigatory and not simply the occasion for announcing predetermined discipline; (2) the employee reasonably expects the meeting will result in disciplinary action; and (3) the employee requests representation. A *Weingarten* violation will be found where the request for representation is denied and the employer continues to question the employee. If, after choosing to deny the request, the employer immediately terminates the inquiry, there is no *Weingarten* violation. *Id.* at 257–58, 95 S.Ct. at 963–64.

ITT maintains that Terry Williams' *Weingarten* rights were not violated for three reasons. First, the company argues that the decision to suspend Williams was arrived at prior to the meeting and, therefore, that the meeting was disciplinary rather than investigatory. Second, ITT maintains that the decision in *Weingarten* should be construed as involving only the right to have a union representative present. Where, as here, there is no certified union and the employee seeks the presence of only a fellow employee, *Weingarten* rights are not implicated. Finally, the company postulates that Williams requested the presence of another employee only to serve as a witness to corroborate his version of what happened in a later grievance procedure. The company asserts that a request based only on such a motivation is not protected by *Weingarten,* which envisioned active participation by the union representative in aid of the employee.

■ Our review of the company's first contention is limited to a determination of whether the Board's finding that the meeting was investigatory is supported by substantial evidence. Two of the supervisors present at the meeting, Fisher and Gray, testified that the decision to suspend Williams was made prior to calling him to the office. Had the meeting with Williams included only the notification of the suspension, we would agree with the company that *Weingarten* does not apply here. However, even if we accept the company's version of the sequence of events—that Williams was notified of the suspension prior to the questioning—we still find a *Weingarten* violation. It is clear from the record that the managers wished to elicit further information pertaining to the suspension.

The Ninth Circuit, in *NLRB v. Texaco, Inc.,* 659 F.2d 124 (9th Cir.1981), dealt with a similar argument by Texaco that the company had made the decision to discipline the employee prior to the meeting. That court held that if the nature of the meeting was investigatory, it did not matter whether the decision might have been arrived at beforehand. Similarly, in the case at hand, the managers prolonged the investigatory stage of the process by persisting in questioning Williams. We hold that the Board's determination that the meeting was investigatory is supported by substantial evidence even if, as the company argues, the managers came to a tentative decision to suspend Williams prior to calling him to the office.

---

1. There is conflicting testimony as to whether the managers notified Williams of his suspension at the meeting described above, possibly even before the questioning began, or at a second meeting later that morning.

In its second argument, ITT maintains that the *Weingarten* rights should not be expanded to include representation by a fellow employee because the Supreme Court's analysis simply does not apply where there is no union involvement. The Supreme Court based its decision in *Weingarten* on the right of employees to engage in concerted activities:

> The union representative whose participation he seeks is, however, safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of imposing punishment unjustly. The representative's presence is an assurance to other employees in the bargaining unit that they, too, can obtain his aid and protection if called upon to attend a like interview. Concerted activity for mutual aid or protection is therefore as present here as it was held to be in *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.,* 130 F.2d 503, 505–506 (CA2 1942) . . . .

*Weingarten, supra,* at 260–61, 95 S.Ct. at 965. ITT asserts that since there was no certified union, the presence of a fellow employee here could not safeguard the activities of bargaining unit employees "in concert" because the observer would have no representative status and no symbolic meaning for the other workers at the plant.

We are faced in this case with the narrow question of whether *Weingarten* should apply to the request of an employee for a fellow employee to be present during an investigatory meeting at a time when a union has been approved by the vote of the employees but when a decision on certification is pending. We specifically do not decide whether *Weingarten* applies to a request for a fellow employee in a workplace which has no history of union organizing or other group activity.

■ . Section 7 by its language protects only "concerted activities" for "mutual aid or protection." Where an individual employee acts only for himself and by himself there is no protected activity. *Royal Devel-*

*opment Co. v. N.L.R.B.,* 703 F.2d 363, 374 (9th Cir.1983). In *Weingarten, supra,* the Supreme Court found concerted activity because the employee requested the aid of a union representative. Even though the investigatory meeting involved the disciplining of only the one employee, the Supreme Court held that there was protected concerted activity because the union representative would safeguard the rights of the entire bargaining unit.

■ In this case, it is somewhat less clear than in *Weingarten* that there is concerted activity because Williams did not request the presence of a union representative. He requested the presence of a fellow employee. We hold, however, that his request was sufficiently related to the concerted activity of bargaining unit employees to make the *Weingarten* rule applicable. The employees had just participated in a vigorous union drive over a period of many months. Both management and the union advocates alleged that the other side had committed unfair labor practices. Williams was an active union supporter as pointedly evidenced by his actions on the day on which he left the plant early—distributing leaflets for the union. He had reason to suspect management of unfair labor practices when he was called to the office. Furthermore, Williams acted on the advice of a union organizer that he request a witness to protect his rights should he be called in to the company office. In this context, it seems clear that his request arose from the concerted activity of the workers.

Our holding in this case is not inconsistent with the recent decision of the Ninth Circuit in *E.I. duPont de Nemours & Co. v. NLRB,* 707 F.2d 1076 (1983). In that case, an employee, Henry Burke, requested that another employee be present at an interview with management held to discuss his allegedly unauthorized visit to his physician. Burke charged that the company had violated his *Weingarten* rights by denying his request. The Ninth Circuit held that Burke's request was not concerted activity and therefore did not trigger the *Weingarten* rights. In that case, however, there

was no history of union organizing at the plant nor was Burke ever involved in any group activity of any sort. The subject of the meeting was an issue effect on the other workers. As the Ninth Circuit stated:

> ... [T]he request of the single employee is not 'concerted activity'; it is the backdrop of other group activity that transforms it into concerted action.... We repeat that we do not foreclose the possibility that a request for a fellow employee may be found concerted in a nonunion setting. Section 7 applies to nonunion employees as well as union employees, *see* NLRB v. Washington Aluminum Co., 370 U.S. 9 [82 S.Ct. 1099, 8 L.Ed.2d 298] (1962) and unionization is not the only sure indicator of concertedness.

707 F.2d at 1079. Here the background of unionization and particularly Williams' participation in the organizing efforts distinguishes the case at hand from *duPont.*

We also find support for our position in the *Weingarten* dissent of Justices Powell and Stewart and in several cases decided by other Circuits. In their criticism of the majority's extension of protected activity under Section 7 of the Act, Justices Powell and Stewart expressed their view that the Court's holding applied to situations in which an employee asks for another employee to be present in the absence of a certified union:

> The Court today construes that right [Section 7] to include union representation or the presence of another employee[1] at any interview the employee reasonably fears might result in disciplinary action.

> [1] While the Court speaks only of the right to insist on the presence of a union representative, it must be assumed that the § 7 right today recognized, affording employees the right to act 'in concert' in employer interviews, also exists in the absence of a recognized union.

*Weingarten, supra,* at 270, 95 S.Ct. at 969 (citation omitted).

In *N.L.R.B. v. Columbia University,* 541 F.2d 922 (2d Cir.1976), the Second Circuit decided that a request for a non-union employee representative to be present was protected under *Weingarten.* In that case, the worker under investigation sought assistance from a fellow employee who had informally tried to bring grievances before the management on behalf of the other workers. The Court stated:

> As Justices Stewart and Powell noted in their dissent in *Weingarten,* ... there can be little doubt that the protection afforded to concerted activities under the NLRA applies equally to workers in unionized or in non-unionized firms.

*Id.* at 931. The Court continued in a footnote as follows:

> The representative right is guaranteed and therefore the right cannot be made to depend upon whether the person accompanying the employee is a union member or is non-union.

*Id.* at 931 n. 5. The employees involved in *Columbia University* had a history of group activity protesting various workplace rules. Even though they were not formally organized as a union, the employees acted in concert and were protected by Section 7 of the Act.

The Fifth Circuit also dealt with this issue, though in dicta, in *Anchortank, Inc. v. N.L.R.B.,* 618 F.2d 1153 (5th Cir.1980). In that case, the Board's decision below did not reflect whether the employee under investigation sought the assistance of someone employed by Anchortank or a non-employee union organizer. The Fifth Circuit assumed, for purposes of its analysis, that the employee requested the presence of a union supporter from outside of the company. The Court remarked, however, that had the record shown that the request was for a fellow employee, *Weingarten* protections would attach. Citing the *Weingarten* dissent discussed above, the Fifth Circuit stated:

> Section 7 protects concerted activity by employees, and one employee's request for the presence of another unit employee at an interview is concerted activity.

*Anchortank, supra,* at 1157. *See also Oil Chemical and Atomic Workers Int. Union AFL–CIO v. N.L.R.B.,* 547 F.2d 575, 592 (D.C.Cir.1976) *cert. denied sub nom. Angle*

*v. N.L.R.B.,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). ("As even the dissenters in *Weingarten* realized ... that decision's elaboration of Section 7 protects the right to act in concert, not merely the right to act in concert with a recognized union."); *Keokuk Gas Service Co. v. N.L.R.B.,* 580 F.2d 328, 334 n. 14 (8th Cir.1978).

For these reasons, we find that Williams' request for the presence of a fellow worker at the meeting was protected under *Weingarten* even though the fellow worker was not and could not have been Williams' certified union representative. Williams sought the protections afforded by acting in concert in the context of a heated union organizing drive. By denying this request, the company violated Section 7 of the Act.

Finally, ITT seeks to draw a distinction between requests for a representative solely to act as a witness for purposes of later proceedings and a representative who will aid the employee at the meeting. The company points to testimony by Williams which indicates that he was advised prior to the meeting to insist on having someone else present to corroborate his version of what occurred at the meeting should he choose to file a grievance. App. at 69–70.

■ The Supreme Court implied in *Weingarten* that one advantage of allowing the employee to be represented at an investigatory confrontation was to assure that the employee would enjoy "recourse to the safeguards of the Act." *Weingarten, supra,* at 262, 95 S.Ct. at 966. As the Second Circuit explained in *Columbia University, supra,* at 930, "One rationale advanced by the Board, a rationale upheld by the [Supreme] Court, for affording the employee the right to have a witness present at such an interview is that a third party can confirm what actually transpires between the employee and employer during the confrontation." We agree that even if Williams' sole interest in having a representative present was to substantiate his story at a later grievance proceeding, the request was a proper one under *Weingarten.* Williams had every reason to want to document what occurred at the meeting with management. By re-

questing a representative, Williams was simply trying to protect himself from retaliation for his pro-union activity. The company violated Williams' rights by denying this request and then continuing to press him concerning his unauthorized absence.

## II. The Harry Merriweather Discharge

The Administrative Law Judge found, and the Board affirmed, that ITT violated Section 8(a)(3) of the Act by terminating employee Harry Merriweather for an unlawful motive. Section 8(a)(3) provides that "[i]t shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment ... to discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). The ALJ determined that the company discriminated against Merriweather by terminating his employment approximately three weeks after the union election in retaliation for Merriweather's support of the union.

Merriweather worked as an order puller in the warehouse of the Mississippi plant from 1972 until March 6, 1979. During the union organizing campaign, Merriweather wore a union button at work, signed a union authorization card and attended at least one union meeting. The ALJ found that one day before the union election, Merriweather's supervisor, Lee Shepherd, questioned Merriweather concerning his preference in the upcoming election and stated that Merriweather and the other employees would later regret their support for the union. Three weeks after the election, Merriweather left work at 11:30 A.M. and did not return that day although his shift ended at 4:00 P.M. Personnel Manager Richard Covington explained to Merriweather the following morning that he had been discharged for leaving work early.

The Board contends that the reason put forward by the company for firing Merriweather was pretextual. In testimony before the ALJ, Merriweather stated that he had been given permission to leave work early if he finished pulling his orders for the day. This testimony was corroborated by a secretary, Sadie Loveless, who was

present during the conversation in which Merriweather asked for permission to leave early. ITT, on the other hand, contests Merriweather's version of the story, claiming that Shepherd specifically denied Merriweather the permission he sought. The company asserts that the ALJ erroneously credited the testimony of the discriminatee, Merriweather, and discredited the testimony of Shepherd and another witness, Sammie Williams, who had testified at a prior hearing that he had overheard Shepherd refuse Merriweather's request.

■ The Board's determination to affirm the findings of the ALJ must be upheld if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). Furthermore, this Court will not disturb reasonable findings of the Board or the ALJ as to the credibility of the various witnesses' testimony since it is they who have observed the demeanor of the witnesses. *See, e.g., NLRB v. Rawac Plating Co.,* 422 F.2d 1259, 1260 (6th Cir.1970).

■ In this case, the Board has established by a preponderance of the evidence that there was anti-union animus on the part of the company. The Board properly considered evidence of the threat made by Shepherd to Merriweather the day prior to the election. In addition, there was convincing proof showing that the company had never fired an employee for leaving early and had never issued a warning to Merriweather even though he had left before the end of his shift several times prior to the union organizing drive. The ALJ chose to credit the testimony of Merriweather and Sadie Loveless that Merriweather was given permission to leave early; this was not clearly erroneous.

■ The company has failed to overcome this proof with a showing by a preponderance of the evidence that the managers would have fired Merriweather despite their anti-union motivation. The only evidence submitted by the company was the testimony of Shepherd and the witness, Sammie Williams, that Merriweather was denied authorization to leave at 11:30 A.M.

This testimony was discredited by the ALJ who had the opportunity to observe the demeanor of the witnesses. We find that the ALJ and the Board relied upon substantial evidence in their holdings that the company violated Section 8(a)(3) of the Act by wrongfully terminating Harry Merriweather.

### III. The Transfer of Jo Ann Gray

Employee Jo Ann Gray was a group leader at the main Southaven plant where she worked in the shipping department. Gray was the most active group leader in support of the union during the heated organizing drive. Gray spoke out in favor of the union at several union meetings, met with the union's International representatives and wore pro-union t-shirts. On December 4, 1978, during the union drive, the company transferred Gray to the Memphis distribution center. The company concedes that the transfer was intended to curb Gray's pro-union activities among the larger group of employees at the Southaven plant.

The Board found that ITT violated Sections 8(a)(1) and (3) of the Act by transferring Jo Ann Gray. Those sections provide in relevant part that:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 157 of this title; . . .

(3) by discrimination in regard to . . . any term or condition of employment to encourage or discourage any membership in any labor organization. . . .

29 U.S.C. § 158(a)(1) and (3). Congress, however, excluded supervisors from coverage of the Act and thus from protection against transfers for anti-union motivations. Supervisors are defined in Section 2(11) of the Act to be:

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connec-

tion with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The company maintains that Jo Ann Gray was a supervisor at the time when she was transferred. The ALJ and the Board found, however, that though she had the job title of group leader, Gray did not possess the authority to exercise supervisory functions.

Gray's status as a supervisor was an issue in a collateral proceeding involving the company's refusal to bargain with the union. The company challenged the certification of the union because the company claimed that 31 supervisors were unlawfully permitted to vote in the election. At the first level of review, the Hearing Officer found that the group leaders, including Jo Ann Gray, were all supervisors but that they were "minor" supervisors. On appeal, the Board found that there was sufficient uncontradicted evidence to show that fifteen group leaders were supervisors but that it was unnecessary to determine the status of the remaining sixteen group leaders (including Gray) since such a determination would not change the election results.[2]

The company appealed the Board's findings to the Second Circuit, arguing that the remaining sixteen group leaders were supervisors. The Second Circuit remanded the case to the Board for further findings as to (1) the supervisory status of the sixteen group leaders; and (2) the extent of their prounion activity. *ITT Lighting Fixtures v. NLRB,* 658 F.2d 934 (2d Cir.1981). On remand, the Board determined that Jo Ann Gray did not "possess any of the indicia of *major* supervisory authority identified by the Second Circuit" while at the Southaven plant. (emphasis added). *ITT Lighting Fixtures, Division of ITT Corp.,* 265 NLRB No. 188 at 11 (1982).

The Second Circuit has now completed its review of the collateral case by setting aside the union election. *ITT Lighting Fixtures v. NLRB,* 712 F.2d 40 (2d Cir.1983). The Second Circuit held, *inter alia,* that the Board had failed, after two opportunities,

to formulate a comprehensible interpretation of the statutory definition of a supervisor.

After perceiving the Board's inconsistency and confusion on this issue in this and the collateral proceedings, and in the interests of comity and consistency of decision among the Circuits, we also reverse the Board. The decision of the Board that Ms. Gray was a supervisor is based on a set of vague and confusing standards which bear little resemblance to the statutory definition. The distinction between "major" and "minor" supervisors, for instance, does not provide any guidance nor is it based on the criteria in the statute. The Board argues before us that Ms. Gray was, without a doubt, a mere employee with no supervisory powers. Yet, the Board was incapable of establishing her status in the collateral proceeding until the Second Circuit, on remand, directed that the Board decide. The Board has failed to carry its burden of proving that the company unlawfully transferred Ms. Gray because the Board has not shown that Ms. Gray is, in fact, protected by the Act.

For the reasons discussed above, we uphold and enforce the Board's order as to employees Merriweather and Williams and reverse the order as to employee Gray.

---

**2.** The union won the election by a 22-vote margin.